at all. Oral argument not to exceed 15 minutes per side. Mr. Davis for the appellate. Thank you, Your Honor. If it please the Court, Hugh Davis for the plaintiff appellant. I'll reserve five minutes. This is a fairly straightforward case in which the central legal issue is that of illegal entry into a private home and whether or not there were sufficient exigent circumstances in order to justify it. This Court ruled in Johnson v. Murphy in 2010 that the exigency required to enter a private home, hot pursuit of a felon, destruction of evidence, to prevent escape, danger to the police or others, or to assist a person who may be injured or ill inside the home. None of those elements appear in this case. And therefore, presumptively, given the authority and the sanctity of the home under the Fourth Amendment, which we cited in our brief, and the presumptive unreasonableness of a warrantless entry, we think that that matter is sufficient for the Court to rule as a matter of law on remand to the district court. Let's just assume if the officer subjectively believed that after Mr. Barton shoved his credentials through the door to be given to the officer and then retreated, if he believed subjectively that Mr. Barton might have been getting a gun, would that justify any fear for officer safety? Would that justify the entry under those circumstances? No, Your Honor. It's mere speculation. He hadn't threatened anybody. He hadn't threatened the officers. He hadn't indicated that he was hostile to them. He asserted his right not to allow them into the house. And when they demanded his identification, he gave it to them. But isn't there a volume of cases that say where assailants, if you will, or individuals are making furtive movements or movements that the officer might reasonably believe are efforts to get a weapon or something, that's enough to put the officer in fear of his personal safety? And if that's the case, why couldn't an officer have asserted that belief here? There are certainly cases which hold that. But in circumstances where the most that could be said was that this fellow fired a BB gun to protect his daughter in his own home from a feral cat, that is at most an ordinance violation. Did the officer receive the information that the weapon he used was a BB gun? We don't know. And he didn't investigate. He didn't ask. He was told at the door that that was the case. And there was no controverting evidence. And therefore, if he assumed that it was a different type weapon, he did so without any objective basis. Is there a state law that makes it a violation to kill an animal? There are two. There's a state statute and there's a local ordinance. But the elements for that are pretty severe. You have to torture, abuse, wound, and cause an actual injury. We set out both the statute and the local ordinance in our brief and conclusively demonstrated that, number one, the elements here weren't met, and that, number two, they never investigated. There was no hurt cat. No cat was even shot with a BB gun. They simply made an assumption that he had killed a cat. They did that on the basis of the local cat lady, Ms. Porter. He said that he implied that he killed a cat, right? No. She didn't do that? He didn't do it. He went down after he fired at the trampoline and scared the cat off, which was what he intended to do. Still, with the BB gun in his hand, went down to Ms. Porter, the lady who fed feral cats and drew up to 40 of them into her yard, and said, the next time a cat comes into my yard and injures my child, it's going to be a dead cat. That's a conditional threat that had nothing to do with what actually happened that day. Okay. I thought that she had said subsequent to that that he bragged about killing the cat. She didn't say that? It's not in anything that I know of. When she was called to court after they brought the charges of animal abuse against him, which were dismissed, she refused to testify and said, I never said anything or expected anything like this, and the charges were dismissed. But when she called the police initially, didn't she report to the police that he had shot a cat in the head or something to that effect? I think she did. Okay. That's a report from an anonymous person that they don't know. That's what I said. Didn't she report that? She reported that. They didn't investigate that. They assumed that he had killed a cat without any basis other than that, shall we say, timorous information. As I see my clock here, I've got three minutes and 55 seconds left. I'll reserve it. Thank you. No, this is your original time. You've got all of your five minutes left. Oh, okay. Then, with regard to the second claim, Officer Vann, the primary defendant here, somehow or another, based on the claim of killing a cat, this incident drew the attention of the entire Lincoln Park Police Department. They went there, and in some way or another, based on a shooting and a death of an animal, they had in their minds developed this into a quasi-barricaded gunman scenario. Officer Vann, at the door, basically said, just show us your ID. You're not under arrest. We'll leave. That's reasonable. Mr. Barden wouldn't come out. He had his mother-in-law hand his identification out, but it was a ruse. When she opened the screen to hand his identification out, that's when Vann burst through the door, rushed into the house, and slammed him into the cabinet, injuring him in his ear. Police can lie in their investigations. Police can lie to try to get confessions, but police can't lie to enter a home without a warrant, and that's what happened here. That's why the entry to the home was basically illegal. It was a ruse, and it was a ruse which had no basis in fact, and resulted in injury. That's another reason why the central constitutional claim in the case is illegal entry. Secondarily, we'll argue about the severity of the injuries. The district court, in our view, misconstrued the necessity of a severe injury or medical treatment or a permanent injury. So he alleged that the handcuffs were too tight, and his wrists were injured. He alleged that when they put his hands forcibly behind his back, they aggravated apparently a pre-existing injury to his shoulder, and that he alleged they threw him down, I guess, the porch steps, and that caused, while he was handcuffed, and that caused a further injury. Is that correct? That's correct. So did he complain to the police about the handcuffs being too tight? He did in the police car. He didn't, so far as I know, on the record, but what he told them was, and he tried to tell them that he couldn't put his arms behind his back. Mr. Barton is a factory worker. He had a pre-existing injury and condition to his right shoulder, and to this day he needs rotator cuff surgery. So when he tried to tell them that my arms won't go behind their back, and Van says, I'll make them go behind your back, and did, and then not only forced the arms back, but tightened the handcuffs to the point to where there were marks left days later, this court decided in Castro v. Troy back in 1989 that excessive handcuffing is a Fourth Amendment violation. Does the person who's being handcuffed have to complain that they're on too tight? They don't have to, because if they're on too tight, they're on too tight, but he did. Well, I know, but in order for the officer to know that they're too tight, he knew that your client had a bad shoulder, but did your client ever tell him that the handcuffs were too tight, or did he tell some other officer that? He told another officer he was immediately removed, thrown down the front stairs, and put in the back seat of the squad car. Whoever the officers were that were driving that squad car were immediately informed that they were too tight. I'm out of time. Thank you. Yes, ma'am. You have your full rebuttal. Good morning. Good morning. May it please the Court. Julie O'Connor appearing on behalf of the defendant, Appley Officer Dean Vann. We do believe that there was sufficient information available. Could you keep your voice up just a little, please, ma'am? We do believe that there was sufficient information available to the officers to determine that exigent circumstances existed. Would you identify the particular exigent – first of all, you heard Mr. Davis go through the various exigent circumstances that would warrant entry. Which exigent circumstances existed in this occasion to allow the officers to go in with the information they had at the time? There was several pieces of information, Your Honor, which were available to the officers prior to the time the actual entry into the home took place. There had been a 9-11 call made by the neighbor to the dispatcher, and that call stated that her neighbor, whom she identified, had admitted shooting a cat with a gun. That was relayed to the dispatcher. Secondly, the complaint was investigated by an animal control officer, Officer Manchester, who came to first talk to Ms. Porter. And, again, she confirmed to him that that had taken place. At the time, the – Did the animal control officer talk to Mr. Barton? He did. He, at that point, went to Mr. Barton, attempted to make an investigation as to the circumstances which had occurred. Mr. Barton was, at that point, highly uncooperative. He refused to provide – You said he shot into the trampoline leg or something like that, didn't he? He had indicated in his testimony that what he had done was not to shoot the cat, but that he had shot at the cat in an attempt to scare the cat away. What he had done is he had shot his gun into the leg of a trampoline on which his daughter was playing in an attempt to scare the cat away. That was his information to the district court, and that was accepted. And he told the animal control officer that the cat, the large cat, was clawing at his daughter as his daughter played on the trampoline. He told the – according to Officer Manchester, he did not state that to him. Okay. He stated to him that he had shot the cat, but he was unwilling to provide any further information, any identification. In fact, he directed the officer to leave his home in a rather hostile fashion, and that officer was concerned enough – he was not armed with a gun – he was concerned enough that he felt threatened. He knew that the plaintiff had used a firearm. He couldn't see the firearm looking into the house, and he retreated, and he called for backup. How did he know the officer – I mean, the person that used the firearm? Was he relying on a report from the neighbor? From the report on the neighbor and from Mr. Barton's testimony to him. He testified – Statement to him. Statement to him, excuse me, yes, that he had shot the cat. What was the main statement that the neighbor said that justified their arresting the man? Her statement was that he had admitted to her that he shot the cat with a weapon. But I thought you said he said he shot at the cat, shot the bottom of the trampoline. His testimony. His statement. Yes, his statement was that he had shot – not shot the cat, shot at the cat. And, in fact, that it had been nearby, an arm, a leg of the trampoline on which his daughter was playing. Is that a big difference? You keep saying he admitted that he shot the cat, but what I thought he said was he shot – Well, two different things. Right. The neighbor is saying that he admitted to her he shot the cat. Okay. Officer Manchester admitted that he made the same statement to Officer Manchester when he was investigating the complaint that he shot the cat. Well, Mr. Davis said that the neighbor just said something that was innocuous. It didn't say that the plaintiff there shot her cat. Did she say that? Actually, her statement to the dispatcher was that he had shot the cat. Okay. And she didn't know what the weapon was. They were unaware of what weapon was being used. What's a law require something like this? You have to – Well – Just shooting a cat, is that a violation of state law or local law? Well, there is both a state statute and there is a local ordinance that prohibits cruelty to animals. Okay. It prohibits not only killing or torture, but it prohibits several other things, which includes tormenting or disfiguring a cat. So it would be possible that if – and even taking his statement that he had shot at the trampoline rather than at the cat, it would still be possible that this was a violation of the ordinance and the statute. Does the ordinance make an exception, though, when there is reasonable fear of bodily harm from an animal to an individual, such as a child in this instance? It talks about just cause. The ordinance does not make that exclusion. The state statute does reference just cause for killing, torturing, whatever. But in this situation, we're talking about a cat. We're not talking about a lion. It's not something that is going to put someone in fear of their life. And it's certainly possible. If it's a feral cat, the owner doesn't know whether the cat has a disease, that the cat could scratch a child and cause severe injury. So he doesn't know. He doesn't know that. But what he did say is that he shot at the trampoline leg. Still, considering that, there is a very real possibility with a bullet or if it turned out a BB gun is shot at something like that, it could ricochet. It could injure the animal. It could potentially actually be dangerous to his daughter. Would that give the officer the right to go in the complainant's house and arrest him and take him off to jail, really? Well, we have additional information that was available to the officers before this entry into the home took place, and that was Officer Manchester's investigation, which was obstructed by Mr. Barton. He was not cooperating. He was hostile. He had demanded the officer get off his property, and the officer actually felt threatened by Mr. Barton's behavior to the extent that he went back to his vehicle and that he requested backup from additional officers of Lincoln Park, which is how they happened to come on the scene. The officer tore the screen door out or something, didn't he? At least that's what they claim. The issue there, and with the information that was present, that there had been a dispatcher that a guy was shooting a gun at cats and killing cats, they were aware of that. They were aware of Officer Manchester's indication that it had been a threatening situation to him, which he was not armed, which had required him to retreat and to seek additional assistance from the patrol cars. But even when the other officers arrived, they experienced the same lack of cooperation, the same refusal to provide identification, the same refusal to talk to the officers. They additionally noted that it was a chaotic situation. There were relatives on the porch who were also yelling, screaming. It was very tense. So are you arguing that there were repeated attempts to get identification before Mr. Barton produced identification through the screen door to the mother-in-law? Yes, yes. That's fairly well established in the record that there were. There were several attempts to do this and that the refusal continued. Eventually, he did, I believe, take out identification and push it through the screen. At that point, he again retreated into the kitchen where the officers could not see him. And Officer Vann's decision-making at that point was that he was concerned based on the other pieces of information, which indicated that firearms had been used, the neighbor's call to 911, to the dispatcher that he had killed a cat with a gun, the threats to the neighbor that he would use that weapon again if a cat came into her yard, Officer Manchester's very real concern that his safety was at issue, which caused him to retreat from Plaintiff's property and seek additional assistance from the other Lincoln Park directors. And his fear of this safety was Mr. Barton's tone, his refusal to cooperate, and his refusal to come out of the house? All of that, in addition to the fact that he had used a weapon before and that he had threatened to use a weapon again. He made that threat in the officer's presence? He made it to the neighbor. His threat was to the neighbor. Did Officer Vann ever see a weapon when he was up there, a BB gun or otherwise? He did not, but it had been reported by the dispatcher that a man was shooting a gun, killing cats, weapon unknown. So there was no... He didn't know that it was a BB gun at that time? He did not at that point. That had not been detailed in the 9-11 call. But this guy who investigated knew it was a BB gun or he didn't know that either? I think he knew that at some later point, the indication that he didn't know it initially. But with the statute, and we're talking about probable cause here, there has to be a possibility, a probability, a real suspicion that there has been a violation of a statute or an ordinance, and in this case there was that probability. We talked earlier about the Michigan, I guess the state law, that provides that you can't kill an animal without just cause. What information did... Not only, Your Honor, pardon me, but not only kill an animal. Or torture, harm, whatever. Mame. That's fine. Disfigure. I know all of those things, but what I'm interested in is the without just cause provision. So what information did Officer Vann have on the just cause aspect, which relates to Mr. Barton? That information had not been relayed to Officer Vann. So are you saying he had none? Well, the information that had been relayed to him is that the animal had been shot with a gun. There was nothing about the child on the trampoline? Other than the plaintiff's indication that his daughter had been on the trampoline. But as I mentioned, even without killing or maming, those statutes provide other things, including disfigurement, including torment. Undoubtedly, an animal like this would have been scared to have had a shot fired. Every reason to think that it was possible that a ricochet from that shot would have hit the animal, possibly even the daughter. That's possible. But that same consideration in not disfiguring an animal would relate to not permitting an animal to disfigure a child by scratching it or clawing it. Now, I understand your issue about the ricochet, but I just want to make sure that when we analyze this, we're talking about all the facts that might have been available to either of the parties at the time of this encounter. Right. Well, Officer Vann, of course, did not know that information at the time. He knew there was a weapon. It had been used, as reported, to kill the cat. Officer Manchester also confirmed that, that he had been told by the plaintiff that he had shot a cat. Officer Vann said that he feared that Mr. Barton might have been grabbing a gun. What are the objective facts that support that belief? What caused him to believe that? He was caused to believe that by the 9-11 call from the dispatcher indicating that he had used his weapon, he had killed an animal. He was also concerned by the information received. But he already had that information when he went to the address. Yes. But he says then, at the time he burst through the door, that he was afraid Mr. Barton might be grabbing the gun. Dispatcher is not in the equation at that point. We're looking at the facts that he, the actions that occurred between the officer and Mr. Barton at that address once the officer arrived. Well, he also was entitled to rely on the information he received from the animal control officer who had been there, who had felt threatened, who stated that Manchester had admitted using a weapon. Again, we're not stating what that weapon was. And his continued retreat into the kitchen where the officers could not see him, given that constellation of information that he had, there was real concern on his part that he could be retrieving a weapon. Did the animal control officer report this to the police department before Van came out there? Or was there subsequent to that? He made a call to the dispatcher. The dispatcher, to my understanding, relayed information, man with gun shooting cats. And the officer had asked for backup. He was uncomfortable. He had retreated from the porch. He was being obstructed in his investigation. There was a hostile tone and behavior, which made him feel that it was a threatening situation to him. And under those circumstances, with the addition of neighbors, not neighbors, but relatives who were on the porch, it was tense. They were extremely loud. They were yelling at the officers. He was concerned that after that... How many people were on the porch? I would... Non-officers, non-law enforcement. Well, there were several law enforcement officers there. No, I said non-law enforcement. Excuse me? Non-law enforcement. How many people other than law enforcement were on the porch? My recollection is I heard three. Three or four, but three relatives. Loud, yelling at the officers, telling them that they needed to leave. It was a rather chaotic situation. And his concern was that there could be a risk of danger based on the information he'd received from various sources, particularly when the plaintiff, again, disappeared into the kitchen, where he could not be seen by the officers. Thank you. You're welcome. Do I have time to discuss anything else, or am I...? You're out of time. Pardon me? You're out of time. I'm out of time. Thank you. Thank you very much. I appreciate it. Okay, whoever has the cell phone needs to get it shut off. Everybody, check your cell phones. Make sure they're shut off or unsilent. The first thing that I would like to comment on is that apparently the defendants don't believe in the Fifth Amendment. Mr. Barton had no duty to cooperate. He had no duty to offer them entry into his home. He had no duty to say he had done anything wrong. He had no duty to speak at all. He had no duty to stay at the door. He simply had no duty. He was in his home. That was it. He didn't want to talk to them, and there's no legal basis why he would have to or should. How did the district court rule on these claims? Was it there was no constitutional violation or it was not clearly established, or both? Argument about clearly established, I don't believe, was ever made in the district court, and there has been no qualified immunity issue on appeal. The district court basically— I thought that's what this is on, is qualified immunity. Is it not on that? It's on a dismissal of the case. Okay. The district court, for reasons I cannot comprehend, ruled that the actions of the officer were justified by the threat that Mr. Barton represented to the officers, and there's simply no basis for that in the record. Mr. Barton never threatened the animal control officer. He never threatened the officers on his porch. He never threatened anybody directly, even Ms. Porter. The most he did was say to her, if I see a cat in my backyard harming my daughter, that's going to be a dead cat, and he did that because she was the cat lady who attracted cats. With regard to the warrant requirement, the house was surrounded. Barton wasn't trying to escape. If they could have gotten a warrant, he couldn't leave. They had every opportunity to do so. They simply didn't. No question that there could have been a better way of handling it. They could have come in there and handed him a summons and told him to report to court and get a search warrant and so forth, but that doesn't necessarily mean civil rights have been violated unless it's under some prior precedent, you know, to show that, in fact, that he couldn't do that. Is there any prior precedent on any of these acts that you're relying upon? Repeatedly we cited the sanctity of the home, the necessity for all of the elements that are required for a warrantless entry under exigent circumstances into the home. That proposition is so well established that even the defendants don't dispute it. They rely on exigent circumstances, and the exigent circumstances simply didn't exist. If there had been a legal basis to enter that home to arrest Mr. Barton, they had ample opportunity to do it. There was no possibility of escape, and they had the premises secured. They simply didn't want to go to that trouble, and they apparently had inflated the incident in their mind to where this guy represented some kind of danger based on speculation. Even the defendant's argument to you, well, when he went back into his own home, they call it retreated into his own home, he gave the idea and he walked away from the door, and they interpreted that as, wow, one, he might get a gun, and then two, he might use it, and three, we might be threatened, even though there had never been a threat against any human being with any weapon by Mr. Barton any time. Well, if he had had a gun and he told them he might use it on them, then they could have entered the house and arrested him, right? I mean, if they had gone through the screen door or whatever it was. If he had threatened the officers saying, I want you to leave my yard, and if you don't, I'm going to shoot you, yes. But none of that happened. He said, I want you to leave my home. I'm not talking to you. I'm not going to cooperate. I don't have to, and I want you to leave. If they could see through the screen door that he, in fact, reached for a gun, would that justify their entry? Not without more. That same reaching for the gun and saying, we'll get a warrant, we'll be back to see you. Is that what they should have done? The Second Amendment allows citizens to have guns in their home, and the fact that one has one or even holds one without more doesn't justify any sort of action by the authorities. Well, both sides could have used a little more diplomacy in this case, I assure you on that. There's no question that it is a bizarre incident which developed out of petty circumstances. Thank you, sir. You're out of time. We appreciate your arguments. The matter is submitted, and we will enter our ruling in due course after we have given the judge an opportunity to hear the tapes and consider the arguments. Thank you.